# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| BRIANNA BOE, et al., | |
| Plaintiffs, | |
| v. | No. 2:22-cv-00184-LCB-CWB |
| STEVE MARSHALL, et al., | |
| Defendants. | |

### DECLARATION OF WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH IN SUPPORT OF JOINT MOTION OF NONPARTIES AMERICAN ACADEMY OF PEDIATRICS, WORLD PROFESSIONAL ASSOCIATION FOR TRANSGENDER HEALTH, AND ENDOCRINE SOCIETY TO QUASH RULE 45 SUBPOENAS

I, ███████, declare as follows:

1. I am the ███████ of the World Professional Association for Transgender Health ("WPATH"). If called upon to testify as to the facts set forth herein, I could and would testify competently thereto.

2. I have been the ███████ of WPATH since ███████, and was an ███████ from ███████ to ███████. As ███████, my work involves, among other things, developing board policies and systems to ensure the efficiency and effectiveness of the organization; ensuring ongoing measurement of deliverables for projects and initiatives; supporting

1

        the organization's mission and strategies; continuously improving processes for the organization to meet both long- and short-term objectives; setting standards and expectations for governing the organization; understanding and overseeing the current and future financial resources and expenditures of the organization; and guiding revenue-generating activities to ensure adequate income to the organization.

3. I have spent nearly seven years working with hundreds of members and dozens of partner organizations on issues in transgender health, and I have extensive knowledge of, and oversee WPATH's internal operations.

Background

4. WPATH, founded in 1979, is a 501(c)(3) non-profit interdisciplinary professional and educational organization devoted to transgender health. WPATH's mission is to promote evidence-based care, education, research, public policy, and respect in transgender health. To that end, WPATH is internationally recognized for establishing Standards of Care for the treatment of individuals with gender dysphoria—these standards articulate a professional consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria. Many WPATH members engage in clinical and academic research to develop evidence-based medicine.

5. WPATH is an international membership organization, and it has regional affiliated organizations in Europe, Asia, and the United States. These organizations work collaboratively to help ensure safe, competent, and available healthcare for transgender and gender diverse ("TGD") people around the world. The voting membership of WPATH consists of professionals working across a wide range of disciplines that encompass total care for TGD individuals, such as medicine, psychology, law, social work, counseling, psychotherapy, nursing, family studies, sociology, speech, and voice therapy, sexology, and more. WPATH members work together to increase access to competent care and address the needs and concerns of TGD people through collaboration of their expertise in education, advocacy, clinical medicine, research, and communication.

6. WPATH engages in a number of activities, including the publishing of its official journal, the International Journal of Transgender Health, a peer-reviewed medical journal. WPATH also hosts book clubs and journal clubs, which provide members and others working in TGD health the opportunity to interact, collaborate, and learn from their colleagues who are leading authors, clinicians, and expert researchers in transgender health. WPATH holds educational symposia, courses, and workshops to improve access to accurate and up-to-date information and research in the field of transgender health.

3

The Subpoena

7. I have reviewed the non-party subpoena issued to WPATH by the State of Alabama, which covers a broad range of topics and issues that relate to many different aspects of WPATH's work. Responding to the subpoena would require WPATH to identify and speak with multiple potential document custodians from across the organization, including at least the following groups within WPATH: the board of directors, executive committee, SOC8 co-chairs, SOC8 chapter leads, SOC8 chapter members, IT department, and consultants. Then, we would need to collect potentially responsive documents from those individuals. These documents would then need to be reviewed by me. The scope of these requests, in their current state, would mean that I could no longer dedicate my time to completing the daily tasks necessary to manage the association. The scope of this search would also unduly burden my staff, in that it would require the assistance of other team members, who would then be unable to function in their roles at WPATH.

8. Given the breadth of the requests as drafted, it is possible WPATH would need to collect Electronically Stored Information ("ESI"), such as custodial email files, from some or all of those individuals. Moreover, a number of our members utilize their own personal and business e-mail addresses to communicate with other members. These members come from a wide range

of disciplines and employers, including hospitals, medical groups, and educational institutions. Any ESI search and production of these e-mail addresses would require notice to their employers, as well as additional review to ensure that protected or confidential information was properly redacted.

9. Because WPATH does not have an in-house e-discovery function, we would likely need to retain a third-party vendor to collect and process those documents. Any collected documents would also need to be reviewed by attorneys for responsiveness, privilege, and other issues. While our pro bono counsel may assist with that, depending on the volume of documents, WPATH could need to retain additional contract attorneys to review the materials. I would also need to closely review the responsiveness and privilege determinations. Screening for this information would require additional time from my team. We would also likely need a vendor to process the responsive documents for production to the State. I have reviewed a number of quotes from associations that needed to retain these services and I understand that discovery costs of this type can often run into the tens of thousands of dollars.

10. In my view, the work I have described that would be required to respond to the subpoena as drafted would distract my team from the critically important,

time-sensitive work we do advancing and improving healthcare for transgender individuals.

11. I also view this subpoena, which requests our private, confidential internal communications, as exceedingly intrusive. It requests the production of internal communications with our members and partners, including internal chats, emails, notes, drafts, and social media posts. Our members use all of these channels to communicate with each other and engage in open discussions of WPATH's work product.

12. Based on my nearly seven years of experience working WPATH members, I believe that our staff and members will communicate less if the State's subpoena is enforced. Our staff is already more cautious about sending written communications for fear that they will be produced and taken out-of-context in an attempt to misuse and harm the persons we are trying help. I am also concerned that new members will fear joining if they know their private emails and comments shared with us could subject them to harassment arising from this litigation. Over the last several years, as TGD health has become the subject of charged rhetoric, our members have been increasingly harassed, intimidated, and subjected to threats of harm. For example, our members have been illegally videotaped during educational presentations and had their intellectual property misused and edited to fit an agenda that has led to threats

6

of violence. Members experience weekly attacks via email, phone calls and threatening voicemails, and social media messages and posts threatening and harassing them by name.

13. My staff and I have received weekly emails that include threats of violence and shaming; some excerpts from these include: "*It is unconscionable that you have lowered the age for hormone treatment from an age that was already TOO LOW. What you are doing amounts to child abuse and I will do everything in my power to 1) spread the word that you are abusing and mutilating children and 2) undermine and destroy your organization before you can do any more harm to children. Mark my words: this is a war.*" Not only is this statement false, but it was sent to us almost immediately following false news reports regarding age limits.

14. Another example reads, "*I am filing with the international criminal court against you. Transgender people are scientifically proven molestation and sexual abuse victims. Your attempt to hide the child molesters will get you killed. If I see you or anyone who supports you. I will kill them.*" These examples are only two of many examples of attempts to harass, intimidate, and ultimately chill the work of members and staff of WPATH.

15. This subpoena has also created a notable chill on our educational efforts. As a result of this subpoena, whenever WPATH prepares to submit a new amicus

7

filing, send a letter to the government, or issue a new policy statement, our board now considers whether this will open us to more subpoenas. In addition, due to the recent breaches that have occurred involving snippets of presentations being taken out of context, digitally manipulated, and used against the care we are seeking to provide, WPATH has had to cancel its planned educational courses and workshops in November and December to investigate stronger security measures to protect the faculty and staff. Faculty that have participated in many past projects are tenuous, and must now seek approval from their employers (hospitals, universities, etc.) to participate, as they must now consider whether risking the safety of their facilities is worth getting the research and data out to those in the field.

16. Open, honest dialogue is also essential to the accuracy of our work and practice recommendations, which medical professionals across many specialties use to inform their medical decision-making. We work with dozens of medical experts every year to understand the latest science, and to review and edit our publications, educational materials, curriculum, and public statements. These experts are volunteers and do this work out of a need to help improve care for transgender individuals. Having personally worked with many of them for years, I know that many would think twice before volunteering their expertise if their confidential feedback could be shared with

the world. Our ability to receive candid feedback depends on the confidence that peer reviews and communications within WPATH will not be publicly disclosed. Based on my experience, I believe enforcement of this subpoena will greatly hinder the quality and accuracy of our work product, which in turn will worsen the care that our members provide to their patients across all health domains.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Roanoke, VA, on December 23, 2022.



WPATH